UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK

11/23/2015 3:36 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

----------------------------------------------------------X

40 CPS ASSOCIATES, LLC,

                               Appellant,

          -against-

THE VILLANO FAMILY LIMITED
PARTNERSHIP, CHRISTOPHER VILLANO,
ALLAN B. MENDELSOHN, Chapter 7 Trustee,
NEW YORK STATE DEPARTMENT OF
TAXATION AND FINANCE, and
UNITED STATES TRUSTEE,

                              Appellees.

----------------------------------------------------------X

**ORDER**
**15 CV 2055(SJF)**

FEUERSTEIN, J.,

      On April 10, 2015, appellant 40 CPS Associates, LLC ("appellant" or "CPS") filed in the

United States Bankruptcy Court for the Eastern District of New York ("the bankruptcy court") a

notice of appeal to this Court from an order of the bankruptcy court (Grossman, U.S.B.J.), dated

March 30, 2015, authorizing appellees The Villano Family Limited Partnership ("VFLP") and

Christopher Villano (collectively, "appellees") to object "to any or all of the claims asserted

against the estate of MMR Ventures, LLC (the 'Debtor')[,]" ("the Objection Order"), including

appellant's claim for payment of an administrative expense for post-petition rent and/or post-

petition use and occupancy of certain real property by the Debtor.  For the reasons set forth

below, appellant's motion for leave to file an interlocutory appeal is denied and the appeal is

dismissed.

1

I.    Background

On March 19, 2012 ("the Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("the Bankruptcy Code") in the bankruptcy court.  At that time, Debtor managed and operated a bar and restaurant known as "Mickey Mantle's," a/k/a "Mickey Mantles," in a building owned by appellant on the premises located at Central Park South and West 58th Street, New York, New York ("the subject premises").

VFLP holds one hundred percent (100%) of the outstanding membership interests, and was the managing member, of the Debtor, and holds a general unsecured claim in the amount of one hundred twenty-five thousand dollars ($125,000.00) against the Debtor's estate, for which it filed a proof of claim in the bankruptcy court.

Christopher Villano is the "responsible person" with regard to certain of the Debtor's tax obligations.

The lease covering the subject premises ("the Lease"), dated August 1, 1987, was between 40 Central Park South, Incorporated, appellant's predecessor in interest, as landlord, and Liederman/Lowy Ventures, Inc., predecessor in interest to Majestic Sports, Inc. ("Majestic"), an affiliate of the Debtor, as tenant.[1]  The Debtor was not a party to the Lease.

On June 4, 2012 ("the Conversion Date"), both the Debtor's and Majestic's Chapter 11 cases were converted to cases under Chapter 7 of the Bankruptcy Code and Allan B. Mendelsohn ("the Trustee") was appointed as Chapter 7 trustee of both estates.  The Trustee surrendered

---

[1]  Majestic filed its own voluntary petition for relief under Chapter 11 of the Bankruptcy Code on or about February 7, 2012.

possession of the subject premises to appellant on June 28, 2012 ("the Surrender Date"). Although the Debtor remained in possession of the subject premises, and continued to operate its restaurant thereupon, from the Petition Date until the Conversion Date, it did not pay any post-petition rent to appellant. The Trustee occupied the subject premises from the Conversion Date until the Surrender Date ("the Trustee Occupancy Period") without paying any post-petition rent to appellant.

On September 4, 2012, appellant filed in the bankruptcy court: (1) a general unsecured claim in the Debtor's case in the total amount of one million six hundred thirty-two thousand nine hundred twenty-four dollars and fifty-three cents ($1,632,924.53) for pre-petition rent arrears purportedly due and owing under the Lease as of the Petition Date and damages arising from the rejection of the Lease ("the Unsecured Claim"), (Appendix to Brief of Appellant pursuant to Fed. R. Bankr. P. 8018 ["A1."] at 68-83)[2]; (2) a general unsecured claim in the Majestic case in the total amount of one million six hundred forty-four thousand two hundred seventy-eight dollars and sixty-eight cents ($1,644,278.68) for pre-petition rent arrears purportedly due and owing under the Lease as of the Petition Date and damages arising from the rejection of the Lease, (A1. 85-100); and (3) a motion in both cases ("Motion to Compel"), seeking to compel payment of an administrative expense (a) in the amount of one hundred ninety-six thousand eight hundred ninety-nine dollars and eighty-four cents ($196,899.84) on account of the Debtor's use and occupancy of the subject premises from the Petition Date

---

[2] In a rider to the Unsecured Claim, appellant indicated, *inter alia*, that since "[t]he precise nature of the relationship between Majestic and [the Debtor] is unclear[,] [it] file[d] this proof of claim in an abundance of caution to protect its rights in the event that the Debtor is determined to be liable for amounts owed under the Lease." (A1. 71).

through the Surrender Date, i.e., from March 19, 2012 through June 28, 2012, and (b) in the amount of two hundred seventy-one thousand nine hundred forty-six dollars and sixty-five cents ($271,946.65) on account of rent owed under the Lease from the date Majestic filed its Chapter 11 petition through the Surrender Date, (A1. at 16-25).

On November 7, 2012, the bankruptcy court entered a Stipulation and Consent Order ("the Consent Order") between the Trustee, appellant and Majestic, resolving so much of appellant's Motion to Compel as sought immediate payment of an administrative expense in the amount of the prorated rent due and owing under the Lease for the Trustee Occupancy Period, i.e., from the Conversion Date through the Surrender Date. (A1. 26-30). The Consent Order provides, in relevant part:

> "1.  Preservation of Claims by [Appellant]: All claims by [appellant] against the Debtor[] [and Majestic] and their estates, except those claims described in paragraph 3 below, are expressly preserved. The preserved claims include, but are not limited to, (i) all general unsecured claims of [appellant], including any claims for pre-petition amounts owed under the Lease or damages arising from the rejection of the Lease; (ii) all post-petition claims of [appellant] relating to the period prior to the [Conversion Date], including any claims entitled to administrative priority under 11 U.S.C. § 503(b) for such period and any claims for amounts owed under the Lease pursuant to 11 U.S.C. § 365(d)(3) for such period; and (iii) all secured claim [sic] of [appellant], including any claims secured by a security deposit under the Lease. All rights and defenses of the parties to this Stipulation and Consent Order with respect to the preserved claims are expressly preserved."

(A1. 3).

On January 22, 2013, the bankruptcy court entered an order (1) granting appellant an allowed administrative expense claim in the Majestic case "entitled to priority under 11 U.S.C. § 503(b)(1)(A) for all amounts due under . . . [the Lease], for the period from February 7, 2012,

through and including June 3, 2012[,]" (A1. 31-32); (2) deeming appellant's Motion to Compel

to be "a timely filed administrative expense proof of claim ['the Administrative Claim'], . . .

[that] shall not be subject to challenge on the basis of timeliness[,]" (A1. 32); and (3) otherwise

preserving "all rights and defenses of [appellant] and the Trustee . . . with respect to the

[Administrative] Claim." (Id.)

On October 29, 2014, the Trustee filed, *inter alia*, an Amended Chapter 7 Trustee's Final

Report ("the Final Report") in the Debtor's case, (A1. 44-57), pursuant to which, *inter alia*, a

total of sixty-eight thousand five hundred fifty-two dollars and twenty-three cents ($68,552.23)

would be available for distribution to junior creditors of the Debtor's estate after payment in full

of all secured claims and Chapter 7 administrative expenses. (A1. 55). In the Final Report, the

Trustee proposed, *inter alia*, allowing both appellant's Administrative Claim and its Unsecured

Claim (collectively, "the 40 CPS Claims") in the full amounts asserted by appellant, i.e., one

hundred ninety-six thousand eight hundred ninety-nine dollars and eighty-four cents

($196,899.84) and one million three hundred twenty-four thousand four hundred ninety-six

dollars and twenty-eight cents ($1,324,496.28), respectively. (A1. 51, 53).

It is undisputed that the Trustee denied appellees' request to interpose objections to, *inter*

*alia*, the 40 CPS Claims based upon his business judgment. Accordingly, on January 13, 2015,

appellees filed a motion pursuant to Sections 105(a) and 502(a) of the Bankruptcy Code seeking

"leave to interpose and prosecute objections to any or all of the claims asserted against the estate

of [the Debtor]" ("Motion to Object"). (A1. 33-103). Both appellant and the Trustee opposed

the Motion to Object. In his response, (A1. 104-108), the Trustee contended, in relevant part:

    3.    Turning to the red herrings raised by [appellees] in connection with the

claim of [appellant], the Debtor's landlord. . ., [appellees'] arguments are completely misplaced. First, [appellees] make reference to the 'related' chapter 7 case of [Majestic] and the fact that [appellant] filed the exact same claim against both the . . . Debtor as well as Majestic. That is true, however, the reasons for [appellant's] position was as a direct result of the actions taken by both this Debtor and Majestic. . . . Majestic filed the first bankruptcy case. However, Majestic was nothing but a shell corporation which had no operations whatsoever. It was the tenant of [appellant] as it entered into the lease with [appellant]. This Debtor was the entity which operated as a restaurant and did so at the leased premises.

4.  . . . In determining not to commence . . . [an action seeking to recover the rent payments made by the Debtor as potential fraudulent conveyances], it became apparent that the Debtor herein received <u>all</u> of the benefits of operating its restaurant business from the Majestic leased location. . . . Now, [appellees] raise an argument that Majestic has no assets and that somehow [appellant's] recovery should be limited to Majestic. [Appellees] completely ignore the consideration that the Debtor received by occupying and paying for the space.

5.  In addition, as correctly stated by [appellees], before making the instant application, they requested that the Trustee consider objections to [appellant's] . . . claims. The Trustee declined to do so but only after investigating whether such objections would be proper. . . . [A]ny attempt by the Trustee to object to the claim of [appellant] would simply put, be a colossal waste of time and resources of the estate. [Appellees] have already complained to th[e] [bankruptcy court] that the Trustee's counsel has engaged in legal services which resulted in no benefit to the estate. Of course, Trustee's counsel disagrees with [appellees'] arguments relevant to that issue. However, if [appellees] were to complain that the Trustee and his counsel determined to object to claims which, under all reasonable facts and circumstances, shall never receive a distribution, [appellees] would have a good argument. [Appellees] should be forced to pick their poison.

6.  As to the balance of the claims which [appellees] argue should be objected to, for the same reasons as stated herein, there is simply no benefit to any creditors that would be realized in an exercise of futility. The Trustee may well win the battle objecting to claims, however, he would ultimately, lose the war. [Appellant's] claim, which the Trustee believes to be completely valid, along with the allowed claim of [the New York State Taxation and Finance], will exhaust <u>all</u> of the available funds.

7.       While the Trustee has no objection to allowing [appellees] to pursue frivolous claim objections, the Trustee respectfully states that the [Final Report] should be approved so that the legitimate creditors of this estate receive the timely distributions to which they are entitled. [Appellees] should not be able to interfere with the Trustee's fiduciary obligations to real creditors by attempting to muddy the waters for their own pecuniary gain.

(A1. 106-108).

Two (2) hearings were held before the bankruptcy court on appellees' Motion to Object. During the first hearing on February 11, 2015, the bankruptcy court asked appellees' counsel, Mr. Pick, how he would get paid for the work performed by him in reviewing and objecting to the claims asserted against the estate of the Debtor. (Appendix to Appellees' Brief in Opposition to Appeal pursuant to Fed. R. Bankr. P. 8018 ["A2."] at 4).  Appellees' counsel responded as follows:

"At the end of the case, Your Honor, at the end of the case, if we make substantial progress and make a distribution to creditors at that time Your Honor will have or could consider a fee award to our firm or Your Honor could deny any fee award to our firm for the work provided.

At this point in time we're not asking for any fees.  We're not asking to be paid. We're going to hold that off to see what benefit, if any, we make to this estate. We think these claims should be challenged.  We think we can make a distribution to the unsecured creditors.  We think that the trustee has conducted no investigation of these claims. . . ."

(A2. 4-5).  The following colloquy then ensued with respect to appellant's claims:

[Appellees' Counsel]: Now you have a final report and account that's signed by the [T]rustee that says, I have reviewed the claims.  The claims are proper. Wrong.  They aren't proper, they are all wrong especially the claim by [appellant].

Now, with respect to [appellant], we reached out to [appellant's] counsel and we said to them, we think your claim is in error, it should be withdrawn.  No.  I said,

7

okay, fine, you know.  If you don't want to withdraw the claim, that's okay.  What we'd ask you is if you would give us a copy of the new lease to the premises so we can see whether or not [appellant] mitigated [its] damages.  Their response?  We're not giving you anything.  Why not?  Make us an offer.  We're not going to make you an offer based on the fact that you're not providing documentation.  Under 502(b)(6), you are obligated to mitigate the claim.  So now the question arises is, when [appellant] knew the claim was in error.  At the time [appellant] filed it or immediately thereafter?  But clearly the two duplicate claims that [appellant] filed in each of the two cases are wrong.  We're not going to withdraw it.  Go to the judge.  Fine.  I'm not here to fight, we'll go to the judge and we'll present our arguments.  But there is no basis for [appellant] to assert a claim or to be paid in [the Debtor's case].

[Bankruptcy Court]: So you believe you have a good faith basis –

[Appellees' Counsel]: Yes, sir.

[Bankruptcy Court]:  – to go after the claims of [appellant], . . . and that the [T]rustee and his counsel to this point have failed to do that which they should have done, so therefore, you're going to do it.

[Appellees' Counsel]: Exactly correct.

[Bankruptcy Court]: And you're willing to do that essentially, if you don't make any – you don't return any money to the estate you don't get paid, if you do, then it'll be up to the Court.

[Appellees' Counsel]: That's correct.  It's always up to the court if we get paid or not get paid.  I agree with that.

[Bankruptcy Court]: All right.  Mr. Kantrow [the Trustee's counsel], why do you oppose it?

[Trustee's Counsel]: Your Honor, let me address first the claim of [appellant] which I think is the most fascinating.  If you recall, there were two cases that were filed at the beginning.

[Bankruptcy Court]: Did you see the new lease between [appellant] and the new tenant to determine whether or not he's mitigated damages?

[Trustee's Counsel]: No, Your Honor.  We don't believe that under the commercial law he has a duty to mitigate those damages.  And I think that [appellant] addresses that issue as well.

We do know for a fact that [the Debtor] was the operating entity. It, in fact, operated at the location. It received all of the benefit by continuing its operations. It was not the tenant. Majestic –

[Bankruptcy Court]: So a landlord in bankruptcy has no requirement to mitigate damages?

[Trustee's Counsel]: It has no duty to mitigate its damages. First of all, it doesn't know whether or not it's going to have adequate assurance of future performance even if it did lease to another tenant who could dump the lease tomorrow, file its own bankruptcy. So the [T]rustee did not assume –

[Bankruptcy Court]: That wasn't my question. My question was, do you believe that a landlord who files a claim in a bankruptcy, where the debtor is a tenant, has any obligation to show that he mitigated damages?

[Trustee's Counsel]: I don't believe it's obligated to do so, Your Honor.

[Bankruptcy Court]: All right.

[Trustee's Counsel]: I think the case law speaks to that. In addition, we do know that there's 196,000 or $197,000 administrative claim that the [D]ebtor racked up by continuing to operate during the Chapter 11 period at the location. And Majestic, which was the tenant, was a shell company. It had [n]o operations. Its own Chapter 11 petition indicated they had no bank account, no employees, nothing. Also controlled by [appellees].

[Bankruptcy Court]: So [appellant] would be what, piercing a veil, alter ego, how does he get to it?

[Trustee's Counsel]: It would basically be that, however, from the [T]rustee's perspective what we had was a situation of a fight that we were going to take on. In fact, the papers indicate, I think that [appellant] said that also, we looked at whether or not there was a fraudulent conveyance by the [D]ebtor, this [D]ebtor, . . . cutting the checks to [appellant] because it was the operating entity, it was the only one with a bank account, it wrote the checks for the lease, for the rent.

The [T]rustee looked at that and determined, actually contacted [appellant] and said, we're looking at whether or not we have an action for fraudulent conveyance against [appellant]. Negotiations with [appellant] to save the estate the costs of what we thought was going to be pointless and an expense that would not result in a benefit to the creditors of this estate, and [appellees' counsel] has already filed objections to our fees saying we spent money we shouldn't have, had we gone

ahead and spent more money –

[Bankruptcy Court]: Did you cut a deal with [appellant]?

[Trustee's Counsel]: We did. We allowed for them to file the administrative
claim in this case. It resolved the issues. There was a consent and that allowed
for the final proof of claim. We determined that –

[Bankruptcy Court]: Did you get any carve out from them?

[Trustee's Counsel]: We did not. There was nothing there for us to carve out. . . .

(A2. 5-9).

In response to appellees' contention, as stated by the bankruptcy court, that the Trustee

and his counsel did not "do anything" in this case, i.e., "didn't challenge [appellant's] claim, . . .

didn't challenge New York and . . . ran up fees that [they] don't deserve," (A2. 12), the following

exchange took place:

[Trustee's Counsel]: There are three things there, I understand. With regard to –
[appellees' counsel] is correct that he did contact us and we did amend the [Final]
report, reach out to New York State. That was an error on the [T]rustee's part in
the final report. Clearly, it was a mistake.

With regard to [appellant] we did something. We looked at it and the [T]rustee in
his business judgment determined there was no basis. This is a clear cut situation.
[Appellees] own both entities, Majestic and [the Debtor]. So they'd like to now
say the extent of [appellant's] claim should be relegated only to an empty Chapter
7. They can have all the admin claims and all the priority claims and all whatever
claims they want. As against Majestic, it's got absolutely nothing. And for that,
[the Debtor] got all of the benefit. Absolutely all of the consideration was to [the
Debtor]. It operated the restaurant at the location. So the argument is, too bad
that it operated the location there, it was not privity to contract with [appellant],
therefore, there's no claim in this estate.

We can go to an evidentiary hearing and we can wind up having to – the [T]rustee
is not going to participate, he's not going to object so [appellees' counsel] wants
that right to conduct an evidentiary hearing to determine that [appellant] should be
relegated – its claims should be relegated to Majestic.

[Bankruptcy Court]: If he's willing to do it on his nickel and it could benefit you, why do you care?

[Trustee's Counsel]: Because right now all they want to do is reduce their own exposure to tax liability.  So they want the money to be redistributed and then they'd like to hold up the final report.

[Bankruptcy Court]: Mr. Kantrow, why do you care?  If he's willing to do it, he's not seeking to become – if he doesn't succeed at anything, he's not going to get paid anything.  I can tell you that now.  So if he does succeed then doesn't that benefit the estate?

[Trustee's Counsel]: Then they'll [sic] be a distribution to other creditors. Understood.

[Bankruptcy Court]: Isn't that good?

[Trustee's Counsel]: If he can prevail, sure.  But it's basically supplanting their judgment for the [T]rustee's business judgment and making a determination –

[Bankruptcy Court]: No, no, what he's doing is, he's saying I'm willing to litigate, not like a business decision, he's saying the [T]rustee's business decision is obviously in part predicated on whether he wants to spend the estate assets to go after [appellant].

[Trustee's Counsel]: Correct.

[Bankruptcy Court]: If he doesn't have to spend any money I don't know a trustee that I've seen that wouldn't say either I've examined it fully, legally, there is no cause of action here and this estate should not under any circumstance be contesting the claim of the landlord, one thing.  Or it's not – which is the most common that I hear, in my business judgment, makes no economic sense because the risk is too great.

[Trustee's Counsel]: Correct.

[Bankruptcy Court]: Here, you guys are saying the latter, you're not saying the former.  You haven't done an[] exhaustive – because if you'd done that you would have spent the money.

[Trustee's Counsel]: Correct.

[Bankruptcy Court]: So there is no exhaustive study.  I understand [appellant's]

position which is, leave me alone, I don't want to do this.  But [appellees' counsel's] argument is that the tenant because I don't think there's an obligation to mitigate commercial in New York City, from what I remember, but there may be a different construction on a claim in the bankruptcy.  He's really relying on a different analysis than state court commercial mitigation.

But leaving that aside, the argument here is that the tenant is not the debtor.  So, facially, there is no prima facie claim or the claim filed should not be considered a prima facie claim.  And that the objection to it would simply be, it's not a prima facie claim, therefore, I don't, trustee, have the burden of proof, [appellant] does to show why this debtor is liable.

Now [the Trustee's] business judgment. . . who I have a lot of respect for, takes the position that this is a shell entity and [appellant] will be able to quickly establish X and if it were your nickel, you wouldn't spend it hiding [sic] them.  But what's piercing, what's alter ego, you know, it's a tough area.  And I would think that now if somebody says I'll pay that nickel to fight this from the trustee's standpoint, the trustee said, it's not my nickel and I get a benefit, take a shot.  So I don't know why and I – I'll hear from [appellant], don't worry, about why nobody should bring this.  But I think in that context, unless you can argue that [appellees' counsel] has some motive to do this, that is adverse to the interests of the [D]ebtor, the fact that it may benefit somebody along with the [D]ebtor, doesn't trouble me.  If it's adverse to the [D]ebtor, that would trouble me and I don't know at the end if you show that these are shell entities whether – [appellees] . . . may have an alter ego case.  Somebody may be able to go after these guys individually, I don't know where it goes, but my inclination is, if he's doing it under the knowledge that if no money is brought into the estate, I'm not going to further carve up the administrative portion of this to dilute the current administrative creditors.

So, therefore, if he adds a dollar, he may get a piece of that dollar.  No dollars added, we're frozen where we are.  I don't know why [appellees] shouldn't be allowed to do it.  And I don't even know why the [T]rustee would object.

[Trustee's Counsel]: The objection was based upon a good faith resolution of the issues with [appellant] and the [T]rustee has taken a position based upon that.  It looked at the issues, it made a determination. . . .

(A2. 12-16).

After counsel for appellant contended, *inter alia*, that appellant has an "unassailable" and

"ironclad" administrative claim under Section 503(b) of the Bankruptcy Code based upon the

Debtor's use and occupancy of the subject premises to operate a business after the Petition Date, (A2. 19-22), the following ensued:

> [Appellant's Counsel]: . . . The focus here, the issue here is whether or not there's an admin claim and there is. It's either veil piercing or it's a use and occupancy, this is a fruitless exercise. And further, Your Honor, I think everybody in this courtroom knows that [appellees' counsel] is going to look to the estate to compensate himself as a result of pursuing this objection.

> [Bankruptcy Court]: Well, he can look any place he wants, I'm the only one who gives out the money.

> [Appellant's Counsel]: But what that does, Your Honor is, it's shifting the dynamic of the case by allowing a creditor to supplant his judgment for the [T]rustees [sic] and the [T]rustee has wide discretion in fulfilling his duties in order to take a gamble –

> [Bankruptcy Court]: I understand that but the dynamic changes and it does often in these cases where the trustee makes a business decision based on sources of money and what he's going to do with that. And it's not worth in his mind, rolling the dice, to go against you. If it's a free shot, most of the time trustees will say, take it.

> [Appellant's Counsel]: The [T]rustee is attempting to bring this case to a resolution. It's been dragging on for years. [Appellant] is the real creditor in this case.

> [Bankruptcy Court]: All right, let me ask the [T]rustee. . . . If [appellees' counsel] wishes to bring this action and the only compensation he would receive is if, in fact, he increases the pool and then pro rata on the increase, why isn't it in the estate's interest to let him do it?

> [The Trustee]: There's no downside, certainly there's no downside to the –

> [Bankruptcy Court]: No downside.

> [The Trustee]: No, no, absolutely no downside to the estate. I think the point that counsel for [appellant] brought out and certainly my counsel addressed was that we were in a situation with two entities. The tenant under the lease, Majestic[,] and the [D]ebtor, . . . that operated the restaurant. [The Debtor] operated the restaurant from day one, [the Debtor] paid the rent from day one because Majestic had no bank accounts. [The Debtor] . . . had no debtor-in-possession accounts,

was converted in a period of months.  It was a very difficult auction because of its location on Central Park South in New York. [Appellant] was very accommodating to the [T]rustee and the auctioneer to conduct the auction.  We realized approximately $40,000 from that auction.  Somebody– [the Debtor]--

[Bankruptcy Court]: I have no problem where we are.  I mean, I just – case want [sic] to be finished, it could be finished.

[The Trustee]: We just think, Your Honor – understood.

[Bankruptcy Court]: But you have a third party now for whatever reason is saying, I'm going to try to increase the size of this estate and [sic] no cost to – no risk to the [T]rustee, does the [T]rustee object to the Court allowing him to do that?

[The Trustee]: Well, I guess the answer is, Your Honor, and I'm not trying to skirt your question, I just think that in order to answer that question I would have to conclude that no one was entitled to be paid use and occupancy for those premises from the date of filing to the date the [T]rustee vacated the premises.

[Bankruptcy Court]: No, you have to conclude that the use and occupancy is less than $68,000.

[The Trustee]: Which I don't.

[Bankruptcy Court]: No, 197,000.

[The Trustee]: The rent in the lease was $70,000 per month.  So no matter what number Your Honor is going to find at U&O [use and occupancy], assuming for that four month period it comes in at $25,000, which is a fraction of market, this is an exercise in futility, it's going to – granted, not on my dime, it's going to involve litigation in this court that from the [T]rustee's standpoint, it's pointless. Someone is entitled to be paid use and occupancy rent or has an admin claim for the period from the date of filing –

[Bankruptcy Court]: All right, let me ask that.  Mr. Pick, doesn't he have a use and occupancy assumption?

[Appellees' Counsel]: No, not against [the Debtor].

[Bankruptcy Court]: Well, [the Debtor] was the one who occupied the space.

[Appellees' Counsel]: The lease was with Majestic.

[Bankruptcy Court]: We're not talking about the lease. If the lease had been terminated and the debtor was a completely different animal and maintained possession of the space, that debtor is liable for use and occupancy.

\* \* \*

[Bankruptcy Court]: How much of the 197,000 you have is damages under the lease and how much of it is use and occupancy?

[Appellant's Counsel]: All of it is use and occupancy.

[Bankruptcy Court]: So you forget the lease. I don't care about the lease. His only claim now is for use and occupancy.

Say I strike the entire proof of claim, you're back where you started from. He has a use and occupancy claim.

\* \* \*

[Bankruptcy Court]: But he's not fighting under the lease. He's saying forget the lease.

[Appellees' Counsel]: I understand that. But still, U&O is an amount which we're debating. We don't believe he's entitled to 196,000.

[Bankruptcy Court]: Okay. Here's what we're going to do. We're not turning this into an epic fight here. I'm going to adjourn it for a month. If [appellees] can determine within the month solely the U&O issue, that there is some reason his claim of 197,000 which the [D]ebtor, which the [T]rustee and counsel are telling me are attributable to the U&O because they were in there for months without paying, then I'll relook at this. If not, we're done. I don't want nothing else. No other issues. I don't care about the other issues.

(A2. 22-28).

Towards the end of the first hearing, appellant's counsel advised the bankruptcy court that

the amount of the administrative claim "bandied about at th[e] hearing," (A2. 32), i.e., one

hundred ninety-six thousand dollars ($196,000.00), included "rent for the full month of June but

a portion of that was waived as a result of [appellant's] agreement with the [T]rustee" resolving

15

appellant's Motion to Compel.  (Id.)  Appellant's counsel contended that although the amount of

the administrative expense claim should be reduced to exclude the portion of the use and

occupancy during the Trustee Occupancy Period, i.e., from the Conversion Date through the

Surrender Date, the resulting number was still so large as to have no affect upon the estate.  (Id.)

With respect to the issue of discovery, the bankruptcy court stated:

> " I don't even know what the discovery is.  I think the discovery, if it were me,
> would be an expert who testifies what the value – one, whether U&O is entitled is
> probably a legal question not a factual one and what U&O should be.  Maybe a
> dueling expert.  Their guy saying it's X, your guy saying it's Y.  I don't see what
> the discovery of any degree is here because I'm not getting into the lease.  I'm not
> getting into piercing, I'm not getting into fraudulent conveyances, I'm not getting
> into alter egos.  This is simple.  Doesn't matter whether this lease existed or not,
> the [D]ebtor occupied the space and if they are entitled to U&O, there's a number.
> If they're not, make a legal argument.  That's the only issue in front of me."

(A2. 35-36).

On March 24, 2014, appellees filed a supplemental statement ("the Supplemental

Statement") "in response to the [bankruptcy court's] inquiry as to whether [appellant] is entitled

to an allowed administrative expense claim against the estate of [the Debtor] on account of the

Debtor's alleged 'use and occupancy' of [the subject] premises . . . and notwithstanding the fact

that [Majestic], and not the Debtor, is the 'tenant' under the lease of the [subject premises]. . . ."

(A1. 140-148).  In the Supplemental Statement, appellees contended, *inter alia*, (1) that "[t]he

primary issue is whether [appellant] sustained any 'actual damages' as a result of the rejection of

the . . . Lease and/or from the Debtor's use and occupancy of the [subject premises] for the

period [from the Petition Date to the Conversion Date]," (A1. 141) (emphasis omitted); (2) that

"[n]o proof of claim, statements, pleading or other document with regard to the calculation of the

. . . Administrative Claim appears on the docket of the Debtor's case which would . . . provide

[appellees] . . . with sufficient information to determine and/or to properly evaluate the merits of the allowed amount (let alone the merits of any underlying basis for liability)," (A1. 142-43); (3) that the amount of any Administrative Claim should be no more than one hundred seventy-seven thousand eight hundred seventy-four dollars and forty-six cents ($177,874.46), (A1. 143); (4) that the proper amount of the 40 CPS Claims cannot be calculated until a determination is made as to the extent of actual damages sustained by appellant since the new lease for the subject premises, into which it entered approximately six (6) months after the Conversion Date, may have fully mitigated any damages; (5) that "sometime in 2012 and subsequent to Majestic's chapter 11 filing, [appellant] drew down $146,250 from a Letter of Credit that was issued in its favor as a (partial) security deposit under the . . . Lease[]" and misapplied those funds to its claim for pre-petition rent before determining whether it sustained any actual damages, (A1. 147); (6) that there is no indication "as to what happened to an additional $65,000.00 cash security deposit that [appellant] was also holding[,]" (id.); and (7) that if the amounts of the Letter of Credit and cash security deposit, totaling two hundred eleven thousand two hundred fifty dollars ($211,250.00), "were properly applied to the Administrative Claim . . ., then it is [appellant] that would owe the difference to the Trustee and not vice-versa." (Id.)

During the second hearing on March 25, 2015, after appellees' counsel reiterated the contentions set forth in the Supplemental Statement, (A2. 41-42), the following colloquy ensued:

> [Appellees' Counsel]: . . . We saw that [appellant] setoff the one forty six two fifty, we don't know what happened to the 65,000. We can't find it anywhere in the documents. . . . [I]f they have no damages and they only have a U&O claim, in this case we believe it to be $177,000 and they are holding $211,000 as a security deposit, they owe us money.
>
> . . . What we're asking the Court is to allow us to have the authority to conduct a

further investigation of their claim to determine if they're entitled to any monies, if they suffered any actual damages or in the alternative, they owe the estate money. And that's all we're asking the Court as of today.

[Bankruptcy Court]: So the facts necessary for you to prevail would be that the new lease entered into eliminates any unsecured claim because by definition there would be no damages.

[Appellees' Counsel]: Correct.

[Bankruptcy Court]: And while they're not required to enter into a new lease, there's no mitigation of damages. The fact that they did, they can't show damages.

[Appellees' Counsel]: That's correct.

[Bankruptcy Court]: Then the damages they can show for U&O, there's a $20,000 spread between your number and their number, they're sitting with $330,000 between –

[Appellees' Counsel]: $211,250 security deposit.

[Bankruptcy Court]: Plus 68 in cash. So 300 – whatever the number is. And since the U&O is less than that, they owe you the difference.

[Appellees' Counsel]: That's correct.

[Bankruptcy Court]: And the documents that you have that support your position is a lease abstract for the new lease and your ability to calculate the U&O and their failure to give you any basis for their calculation.

[Appellees' Counsel]: I'm sorry, and my ability –

[Bankruptcy Court]: You've claimed that the U&O is 170 something.

[Appellees' Counsel]: Correct.

[Bankruptcy Court]: And you can support that and you say their argument of 190 something is unsupportable or hasn't been supported.

[Appellees' Counsel]: Right. There's no document as to how they came up with that number, whatsoever. We think what they did was, they applied the rent under the Majestic, the date the Majestic case converted and they just used the wrong

numbers.  They made a mistake.

(A2. 42-44).  Thereafter, the following exchange took place between appellant's counsel and the

bankruptcy court:

> [Bankruptcy Court]: . . . The U&O claim [appellees' counsel] says it's 170 some odd thousand, you say 190 some odd.
>
> [Appellant's Counsel]: Well, we actually haven't sat – that's the number that's in the [T]rustee's report.  Even if we accept for argument purposes [appellee's counsel's] number today, there still is not enough money in the estate to satisfy the U&O claim in full.
>
> [Bankruptcy Court]: If you have no unsecured – if you have no damages on the contract and you're holding 300,000 and the U&O is 170 for the moment, why isn't there money?
>
> [Appellant's Counsel]: The amount available for distribution to administrative claims in this case, pursuant to the [T]rustee's report, is only $68,000.
>
> [Bankruptcy Court]: One thing I'm not doing is paying any attention to the [T]rustee's report at this point.  I don't know what he did, I don't know how he got to these numbers and I have little faith in it.  Okay?  So now let's talk facts.
>
> You guys were holding 200 and some odd thousand plus 68 in cash.
>
> [Appellant's Counsel]: That's not correct, Your Honor.
>
> [Bankruptcy Court]: Okay.  What were you holding?
>
> [Appellant's Counsel]: We're not holding – when you say holding, you're referring to the letter of credit?
>
> [Bankruptcy Court]: It's my understanding that you got a deposit in the form of a letter of credit and cash.  Whether you've liquidated and taken it is not what I'm asking.
>
> [Appellant's Counsel]: That's correct.  The $65,000 cash security deposit, which is an asset of the Majestic estate not this estate, remains as it was deposited.
>
> [Bankruptcy Court]: And what happened to the letter of credit?

[Appellant's Counsel]: The letter of credit, prior to the [Debtor's] bankruptcy filing, was drawn down.

[Bankruptcy Court]: Okay.

[Appellant's Counsel]: And used to satisfy prepetition amounts owed. That is taken into account in the proof of claim filed by my client.

[Bankruptcy Court]: So there was a point in time where [appellant] was holding a 200 and some odd thousand dollar letter of credit and 65,000 in cash.

[Appellant's Counsel]: That's correct.

[Bankruptcy Court]: Okay.

[Appellant's Counsel]: Prepetition.

[Bankruptcy Court]: If you applied the letter of credit what did you apply it against?

[Appellant's Counsel]: The prepetition amounts owed under the lease.

[Bankruptcy Court]: So the prepetition amounts owed were over 500?

[Appellant's Counsel]: That's correct, Your Honor.

[Bankruptcy Court]: So the 300 is net of applying the letter of credit.

[Appellant's Counsel]: That's correct, Your Honor.

[Bankruptcy Court]: And so, what your argument is, as long as the U&O is greater than 68, 65,000, nothing else matters because there's no other money.

[Appellant's Counsel]: That's close to our argument but not quite. Our argument is that the $65,000 which secures the prepetition amounts owed and, in fact, in the Majestic case the unsecured claim was asserted as a secured claim.

[Bankruptcy Court]: But the universe is 65,000. If you get it, you don't really care whether you got it for prepetition or you got it for U&O, that's all you're getting.

[Appellant's Counsel]: But it does matter, Your Honor, because what [appellees] are proposing is the setoff of a prepetition obligation against a post-petition obligation. It's an asymmetrical setoff which isn't contemplated by Section 553

of the bankruptcy code. And, in fact, cannot be done.

(A. 47-50).

After the bankruptcy court indicated that the legal issue before it was whether the value of the new lease was relevant to the claim for prepetition accrued lease payments, (A. 51), the following occurred:

> [Bankruptcy Court]: . . . Your universe starts with 300,000 give or take. Letter of credit plus cash. [Appellees'] argument is, when you go through, I think, correct me if I'm wrong, when you go through the entire calculation, [appellant is] owed 170 give or take, which means [appellant] owe[s] [the estate] $130,000 which then goes into an administrative hopper and then if the administrative claims don't eat it up, they'll [sic] be a dollar for the unsecureds. [Appellant] may not like it, but that's the argument, correct?
>
> [Appellees' Counsel]: I'm saying, Your Honor, that they're holding a $221,250 security deposit. They have no prepetition claim, their post-petition claim can't exceed 177, . . . . And he owes us the difference. What I heard today or what I think I've heard today is, he's acknowledged he's holding $65,000 in an account that he hasn't accounted for. And he filed a proof of claim –
>
> [Bankruptcy Court]: No, he said it belongs to somebody else. I think he said it belongs to Majestic.
>
> [Appellees' Counsel]: This 65,000 is an asset paid by –
>
> [Bankruptcy Court]: Well, let's not determine whose it is yet. There is 65,000 and there was a letter of credit. That's how I got to my number.
>
> [Appellees' Counsel]: Correct.
>
> [Bankruptcy Court]: And what you're alleging is, the only thing [appellant] is owed in this case is 170 something thousand.
>
> [Appellees' Counsel]: Yes.
>
> [Bankruptcy Court]: So the spread between those two numbers or some amount of that spread becomes an asset of the estate which will go in a waterfall to administrative and then unsecured, but it'll never get to the unsecureds because the administrative are greater.

(A2. 55-56). The following colloquy ensued in response:

> [Appellant's Counsel]: The entire premise of this calculating based off of security deposits, letters of credit, et cetera, et cetera, is in conflict with the underlying argument that was made on February 11th and is made in [appellees' counsel's] papers that the – there are separate – the hypothetical we are working with is that there are separate entities here. There's a Majestic estate, there's a [Debtor's] estate. The lease, the name on the lease is Majestic, not [the Debtor]. The security deposit, letter of credit, et cetera, were provided pursuant to that lease. The security deposit is listed on Majestic's schedules, it is not listed as an asset in [the Debtor's] schedules. This whole argument about bringing those into this pot is antithetical to the premises of all these arguments. If we are dealing with this estate as a separate estate and not consolidated –

> [Bankruptcy Court]: Well, hold it, hold it, hold it. Are you stating that [the Debtor] doesn't owe you any money?

> [Appellant's Counsel]: No, we're stating that at all but at the prior hearing we assumed for the purposes of argument that we're going to table that argument, arguments about alter ego, arguments about veil piercing, et cetera, et cetera and we are going to focus on the use and occupancy claim and that claim solely. And your instructions to [appellees] were to demonstrate by today that the use and occupancy – the amount of the use and occupancy claim is less than the amount of funds available for distribution to administrative creditors in this case. That amount is $68,552.23.

> [Bankruptcy Court]: No, no, no, no, no. I think what he's saying is that the number is not 68, it's 300 because the 220 and the 65 is a pool of money that should still be sitting in the estate and the most you're owed is 170, therefore, he's owed money.

> [Appellant's Counsel]: But, Your Honor, how could it be sitting [in] the estate if it was never part of this estate?

> [Bankruptcy Court]: I'm not – I'm just trying to repeat what I think is the argument. I'm not making a conclusion. If your argument is that the funds you offset or you want to offset, meaning the letter of credit and the cash, were not funds of this [D]ebtor and this [D]ebtor, in fact, is not the tenant and this [D]ebtor, in fact, doesn't owe money to [appellant], that's a different set of arguments.

> [Appellant's Counsel]: It's an argument in the alternative. There would still be a use and occupancy claim under that hypothetical.

[Bankruptcy Court]: Anybody who uses it is going to have a claim but if [appellees] then establish that it was their money that Majestic used, then you're not going to have any claim on any of it at all, other than the use and occupancy.

If that letter of credit was put up by [the Debtor] and yet [it] is not an obligor under the lease, then you may not have had any right to draw down the letter of credit. . . . [D]oes [the Debtor] owe [appellant] any money . . . [o]ther than the U&O[?]

[Appellant's Counsel]: Our position is yes. But in the event that that is not the case, there's still a U&O claim here. Under either scenario, we have an administrative claim. . . . And there is not enough money in the estate to satisfy that claim in full. That's our argument.

(A2. 57-60).

After the bankruptcy court indicated that it was going to afford appellant an opportunity to respond in writing to appellees' arguments in their Supplemental Statement, the following transpired:

[Bankruptcy Court]: But kind of make it clear to me – your position is that these funds are not [the Debtor's] money that they're Majestic's money.

[Appellant's Counsel]: That – our overall position is that Majestic was an alter ego of [the Debtor] and, therefore, [the Debtor] is obligated under the lease but that position has been rejected –

[Bankruptcy Court]: There's [a] distinction between alter ego and veil piercing, you understand that. If you're telling me that they're alter egos then they are one in the same, then it is [the Debtor's] money.

[Appellant's Counsel]: There may be an alter [e]go issue here. There may be a veil piercing issue here, separately. And regardless of whether [the Debtor] is actually obligated under the lease, is not obligated under the lease but can be held liable for Majestic's obligations under –

[Bankruptcy Court]: Well, if [the Debtor] is not liable under the lease but it was [the Debtor's] money that you used, wouldn't [the Debtor] get that money back in a bankruptcy?

[Appellant's Counsel]: It would – I think that would open a number of questions

23

that involve the interpretation of the language of the letter of credit and numerous other things. We would have to –

[Bankruptcy Court]: No, it doesn't.

[Appellant's Counsel]: Well, what do you mean by money? I mean a letter of credit provides certain terms pursuant to which amounts can be drawn down.

[Bankruptcy Court]: In a bankruptcy proceeding if this [D]ebtor was not liable under the lease but you drew down on a letter of credit supported by its funds, you don't see that as an issue?

[Appellant's Counsel]: If [the Debtor] posted the funds and the letter of credit – upon the posting of the funds, first of all, the funds are assets of the estate, they're no[] longer the [D]ebtor's funds. That's why a draw down of the letter of credit post-petition isn't a stay violation.

[Bankruptcy Court]: Well, I think if you advise clients to draw down letters of credit in the middle of a bankruptcy without seeking the consent of the bankruptcy court you may have some problems but that's up to whatever advice you want to give. I don't think that that would be right.

[Appellant's Counsel]: But moving on from that, if the terms of the letter of credit provide that it may be drawn down upon non-payment of a lease by Majestic, then there wouldn't be an issue. It depends on the letter's terms.

[Bankruptcy Court]: All right. Take whatever position you want. But . . . somebody is going to have to make a little clearer where [appellant's] position is, that [the Debtor] was not an obligor under the lease or [the Debtor] is the alter ego in which case they're both under the lease. If it's not the alter ego and it's not liable, whose money was put up as security and whose money was drawn down? Now, your argument may be it's irrelevant, make whatever argument you want, but I need to understand that.

(A2. 61-63).

The following exchange then occurred between the bankruptcy court and the Trustee's

counsel:

[Trustee's Counsel]: Your Honor, I'm going back to the hearing that we had prior to this. At that time, [appellees' counsel] took a position that there was no claim for any amounts due for the lease because the lease was the obligation of Majestic.

24

If that's the case and Majestic is the sole obligor and Majestic listed on its bankruptcy petition the letter of credit, then the claim is going to be in the Majestic case and then the [T]rustee is going to have to administer that estate to realize those dollars back into the estate only to pay [appellant] because it would be its money –

[Bankruptcy Court]: Or not, because what [appellees' counsel] has shown you is that the lease entered into by [appellant], regardless of who the prior tenant was, may have such value that your estimation of damages is wrong. I don't know. I don't think – one of these estates, the argument is going to be, or both if it's an alter ego, that the value of the new lease, and I know this is not [appellant's] position, I'm just setting it out, that when you calculate the value of the new lease, the only thing left to be paid by someone is $170,000 in U&O and no other monies are due and owing. And if the amount you start with is more than that, there are dollars available to the estate for distribution.

[Trustee's Counsel]: That would come back into the estate and be distributed in the waterfall. I agree with that proposition, Your Honor.

[Bankruptcy Court]: Right.

[Trustee's Counsel]: I don't dispute that. If, in fact, the monies have to come back from [appellant], because it's over collected because it has the letter of credit and the cash deposit.

[Bankruptcy Court]: That's what we have to find out.

[Trustee's Counsel]: I understand that but it's a newly minted argument that comes today. And it did not come at the last hearing when the Court made the analogy –

[Bankruptcy Court]: No, no, no, I think the reason the argument, we'll put it as maturing, is that they never got – they just got an abstract in order to calculate what the value of the new lease is. If the new lease had not been entered into or had no value, then when you go through the calculation the answer to my question would be, even if it's $100, it doesn't matter, because we owe them money. What he's telling me is that on the lease abstract that he would be prepared to establish, that the value of this new lease has eaten up whatever damages, including the prepetition 300, that's his position. I'm not saying that he's right or wrong.

* * *

[Trustee's Counsel]: I understand that but the idea is that [appellant] had a claim

for the breach and we can agree that there's some amount due for prepetition amount whether it's due from Majestic or whether it was due from [the Debtor] because [the Debtor] was the, in fact, tenant. It operated there and Majestic was merely the shell that held the lease. [The Debtor] still benefitted. [Appellant] has an unpaid prepetition claim whether it was against Majestic or against [the Debtor] it was against one of those estates. So there's an unsecured claim for some amount of money that's due.

[Bankruptcy Court]: So you're advocating the position that your client gets nothing.

[Trustee's Counsel]: I'm not advocating that position at all. The [T]rustee is holding a universe, assuming that the professional fees were paid, of $65,000. At the hearing the last time we were here, the Court said, in order for [appellees] to prevail on an objection, they're going to have to demonstrate . . . with evidence, that the U&O was nothing greater than $65,000. In other words, for the months that they were there.

[Bankruptcy Court]: No, but – no, he also asked to see the new lease. This whole argument is predicated on the assumption that this new lease has a greater value than been presented to the Court because nobody told the Court anything.

[Trustee's Counsel]: There was still no duty to mitigate under the New York law.

(A2. 63-66).

Appellee's counsel then summarized its argument as follows:

". . . Your honor, our motion is simply to seek authorization to file objection to claims. Your Honor asked us to address the U&O, we've done that. We think we've established a basis for Your Honor to approve the motion allowing us to look into, object to the claim, get the discovery and report to Your Honor as to whether or not it's a valid objection or not a valid objection."

(A2. 67). The bankruptcy court then indicated that it was "going to let [appellees] file the objection to claim." (Id.) When appellant's counsel started to protest, the bankruptcy court responded that they needed a forum to resolve the issues raised during the hearings and that

" this is now getting a life without a procedural basis. The basis is, they're going to object to your claim, you're going to say I have a valid claim for these reasons. Why can't we do it that way? How else am I doing – otherwise, we're just having

interesting discussions without a proceeding."

(A2. 68). The bankruptcy court further found that appellees established "a colorable argument" that they had a right to pursue, (id.), and made a prima facie showing that appellant's Unsecured Claim "isn't right" and appellant was "not owed that amount of money." (A2. 69). Toward the end of the hearing the following colloquy ensued between appellant's counsel and the bankruptcy court:

> [Appellant's Counsel]: If we were to reduce the damages portion of the [Unsecured] claim or eliminate it entirely, then would that change the procedural framework? What would be the basis for objection because then we would be dealing merely with this issue of whether –
>
> [Bankruptcy Court]: I have no idea, this isn't a question and answer, sir. If you want to file an amended proof of claim, whatever rights you have to do that you can do it. If you want to say to me, but where I'm sitting today is a proof of claim which I believe is facially – has sufficient questions, then it's viable to raise an objection to it. He may not get to a point where he collects any money, but I think he has an obligation to establish what the valid claim is that you're filing. And the one you have now has some problems.
>
> [Appellant's Counsel]: But what is the need to do that if – even if there is no rejection damages –
>
> [Bankruptcy Court]: We're going around in circles. I'm not getting into this debate with you.
>
> [Appellant's Counsel]: All right, thank you, Your Honor.
>
> [Bankruptcy Court]: Listen, you have a proof of claim, if you tell me you're going to file an amended proof of claim that's one thing. If you tell me it is what it is, that's another thing. Just tell me. Are you going to file an amended claim or you're staying with the one you have.
>
> [Appellant's Counsel]: For the time being we will need to stay with the one we have.
>
> [Bankruptcy Court]: Then I'm going to let him file an objection to claim because I already know that there is at least a colorable argument that some of that claim

isn't right.  So there we have it.  Therefore, I'm going to grant the motion to file an objection to claim. . . .

(A2. 70-71).

By order dated March 30, 2015, i.e., the Objection Order, the bankruptcy court granted appellee's Motion to Object and authorized appellees to object "to any or all of the claims asserted against the estate of [the Debtor]," including the 40 CPS Claims.  (A1. 163).

On April 10, 2015, appellant filed a notice of appeal to this Court, (A1. 165-169), as limited by its brief, from so much of the Objection Order as granted appellees authority to object to the allowance of appellant's Administrative Claim.  (*See* Brief of Appellant at 13).  Appellant contends, *inter alia*, (1) that the Objection Order is a final order appealable as of right because it "appoints the Appellees to step into the shoes of the chapter 7 trustee in the Debtor's bankruptcy case and perform a duty specifically reserved for him under the Bankruptcy Code, the duty under 11 U.S.C. § 704(a)(5) to investigate and object to claims if a purpose would be served[,]" (Brief of Appellant at 2-3); and (2) that the bankruptcy court abused its discretion in granting appellees leave to object to the allowance of the appellant's Administrative Claim because "[l]eave to object to the allowance of a claim should only be granted where a creditor requests that the trustee object to a particular claim and the trustee refuses to do so without justifying the failure to act," (id. at 13 (emphasis omitted)), and the Trustee was justified in refusing to object to the allowance of appellant's Administrative Claim.  (Id. at 14-16).

Appellee contends, *inter alia*, (1) that 11 U.S.C. § 502(a) specifically allows a party in interest to object to a proof of claim when the Chapter 7 trustee refuses to do so; and (2) that, in any event, the bankruptcy court did not abuse its discretion in authorizing appellees to file

objections to appellant's Administrative Claim since, *inter alia*, it is undisputed that appellees

are a "party in interest" and the Trustee refused their request to file an objection himself.

## II.    Discussion

### A.    Jurisdiction

"Bankruptcy court rulings are appealable to the district courts pursuant to 28 U.S.C. §

158(a), which gives the district court jurisdiction to review both final determinations and, with

leave, interlocutory orders of the bankruptcy court." First Fidelity Bank, N.A., N.J. v. Hooker

Invs., Inc., ("In re Hooker Invs., Inc.), 937 F.2d 833, 836 (2d Cir. 1991).  Although "the concept

of finality' is more flexible in the bankruptcy context than in ordinary civil litigation[,]" Flor v.

Bot Fin. Corp. ("In re Flor"), 79 F.3d 281, 283 (2d Cir. 1996); accord Liquidators of Lehman

Bros. Australia Ltd. v. Lehman Bros. Special Fin. ("In re Lehman Bros. Holdings Inc."), 697

F.3d 74, 77 (2d Cir. 2012), "orders are appealable as final only if they finally dispose of discrete

disputes within the larger case." In re Hooker Invs., Inc., 937 F.2d at 836 (quotations and citation

omitted); accord Quigley Co. v. Law Offices of Peter G. Angelos ("In re Quigley Co., Inc."), 676

F.3d 45, 51 (2d Cir. 2012).  "[A] 'dispute,' for appealability purposes in the bankruptcy context,

means at least an entire claim on which relief may be granted," Shimer v. Fugazy ("In re Fugazy

Express, Inc."), 982 F.2d 769, 775 (2d Cir. 1992); and not "merely competing contentions with

respect to separable issues[.]" Id.; see also In re Flor, 79 F.3d at 283 ("The resolution of a

'dispute' does not simply refer to the determination of a separable issue.  Rather, a 'dispute' in

this context means at least an entire claim for which relief may be granted.")  "In sum, for a

bankruptcy court order to be final. . ., the order need not resolve all of the issues raised by the

bankruptcy; but it must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief." In re Fugazy Express, Inc., 982 F.2d at 775; accord Pegasus Agency, Inc. v. Grammatikakis ("In re Pegasus Agency, Inc."), 101 F.3d 882, 885 (2d Cir. 1996).

Contrary to appellant's contention, the Objection Order did not "appoint [appellees] to step into the shoes of the chapter 7 trustee in the Debtor's bankruptcy case and perform a duty specifically reserved for him under the Bankruptcy Code[.]" (Appellant's Brief at 2). Although 11 U.S.C. § 704(a)(5) provides that one of the duties of a Chapter 7 trustee is, "if a purpose would be served, [to] examine proofs of claims and object to the allowance of any claim that is improper[,]" there is no indication in that statute that *only* the trustee is entitled to file an objection to a proof of claim. Indeed, Section 502(a) of the Bankruptcy Code provides, in relevant part, that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless *a party in interest*, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects." 11 U.S.C. § 502(a) (emphasis added). "A creditor is a 'party in interest' under § 502(a) and thus, at least in theory, has standing to object to the claim of another creditor." Pascazi v. Fiber Consultants, Inc., 445 B.R. 124, 128 (S.D.N.Y. 2011).

Despite the clear statutory language, a majority of courts hold that generally, "absent leave of court, the chapter 7 trustee alone may interpose objections to proofs of claim." Kowal v. Malkemus ("In re Thompson"), 965 F.2d 1136, 1147 (1ˢᵗ Cir. 1992); see also Pascazi, 445 B.R. at 129 (citing cases); Fed. R. Bankr. P. 3007 advisory committee notes ("While the debtor's other creditors may make objections to the allowance of a claim, the demands of orderly and

expeditious administration have led to a recognition that the right to object is generally exercised

by the trustee. Pursuant to § 502(a) of the Code, however, any party in interest may object to a

claim. But under § 704 the trustee, if any purpose would be served thereby, has the duty to

examine proofs of claim and object to improper claims.")  Under the majority rule, "[l]eave to

object is not generally accorded an individual creditor unless the chapter 7 trustee refuses to

object, notwithstanding a request to do so, and the bankruptcy court permits the creditor to object

in the trustee's stead."  In re Thompson, 865 F.2d at 1147.[3]

However, permitting a creditor, or other party in interest, to object to a proof of claim

instead of the trustee, as specifically authorized by Section 502(a) of the Bankruptcy Code, does

not equate to the appointment of such creditor or party in interest as the chapter 7 trustee, as

suggested by appellant.  Indeed, appellant cites to no authority in support of that contention.

Accordingly, appellant's reliance upon cases finding that an order determining the appointment

of a trustee or professional in a bankruptcy case is a final order for purposes of an appeal, (see

Appellant's Brief at 3), is misplaced.  The Objection Order did not appoint appellees as chapter 7

---

[3]  The majority "rule is premised on the demands of orderly and expeditious administration . . . [because] [i]f every creditor were entitled to challenge the claim of another creditor [], an orderly administration could degrade to chaos." Pascazi, 445 B.R. at 129 (quotations, alterations and citations omitted); but see In re C.P. Hall Co., 513 B.R. 540, 544 (Bankr. N.D.Ill. 2014) (holding that the problem with the majority rule is that its "restriction on creditors' rights is a 'judicial' one that does not appear in the Code itself. . . . The right to object to claims that section 502(a) grants creditors . . . is unqualified. Nowhere is it made subject to 'the needs of orderly and expeditious administration.' It may be that sound bankruptcy policy warrants limiting creditors' rights [that] way, and when it comes to objecting to claims a chapter 7 trustee should be given first crack. But Congress, not the courts, decides what makes for sound bankruptcy policy. When Congress expresses its views in the Code, courts have no business rewriting the Code to suit themselves, 'turning it into something they consider more logical, sensible, or conducive to human enlightenment.'" (citations omitted)).

trustee or a professional in the Debtor's bankruptcy case; it merely authorized them, as a party in

interest, to object to the 40 CPS Claims pursuant to Section 502(a) of the Bankruptcy Code.

An objection to a proof of claim merely initiates a contested matter.[4]  See Pleasant v. TLC

Liquidation Trust ("In re Tender Loving Care Health Servs., Inc."), 562 F.3d 158, 162 (2d Cir.

2009); Fed. R. Bankr. P. 9014, advisory committee notes ("[T]he filing of an objection to a proof

of claim. . . creates a dispute which is a contested matter.")  Since the Objection Order merely

allowed appellees to initiate a contested matter, and did not finally resolve all of the issues

pertaining to that dispute or to a discrete claim in the Debtor's bankruptcy case, it does not

constitute a final determination reviewable by this Court as of right.  See, e.g. White v. Univision

of Virginia, Inc. ("In re Urban Broad. Corp."), 401 F.3d 236, 246-47 (4th Cir. 2005) (affirming,

inter alia, the district court's finding that the bankruptcy court's order denying the appellant's

motions to extend the deadline to file an objection to Univision's proof of claim, to postpone the

hearing, and to authorize the trustee to make a partial distribution were interlocutory); Giles

World Mktg., Inc. v. Boekamp Mfg., Inc., 787 F.2d 746, 748 (1st Cir. 1986) (holding that the

district court's affirmance of the bankruptcy court's order allowing Boekamp to file a formal

proof of claim was not a final order since it neither conclusively allowed the claim nor

determined what amount, if any, the debtor may owe it).  Indeed, the transcript of the second

hearing before the bankruptcy court makes clear that the bankruptcy court contemplates

additional proceedings before it with respect to the 40 CPS Claims.  Accordingly, the Objection

---

[4]  "[D]isputes in bankruptcy are generally classified as either 'adversary proceedings,'
essentially full civil lawsuits carried out under the umbrella of the bankruptcy case, or 'contested
matters,' an undefined catchall for other issues the parties dispute."  Bullard v. Blue Hills Bank,
— U.S. —, 135 S. Ct. 1686, 1694, 191 L. Ed. 2d 621 (2015).

Order is not a final order appealable as of right.

In its notice of appeal, appellant specifically requested that the notice of appeal be deemed a motion for leave to file an interlocutory appeal pursuant to Rule 8004(d) of the Federal Rules of Bankruptcy Procedure "[i]n the event that the appeal of the Order is deemed to be an interlocutory appeal[.]" (A1. 167). "There is no specific guidance in the statute and the Bankruptcy Rules as to when an interlocutory appeal should be granted." Berkowitz v. Club Ventures Invs. LLC ("In re Club Ventures Invs. LLC"), 507 B.R. 91, 97 (S.D.N.Y. 2014). "It has been recognized, however, that the decision is within the district court's sound discretion and that the court may apply, by analogy, the standards set forth in 28 U.S.C. § 1292(b) governing the appealability of interlocutory decisions of district court judges." In re Club Ventures Invs. LLC, 507 B.R. at 97 (quotations and citation omitted); accord Futter v. Duffy ("In re Futter Lumber Corp."), 473 B.R. 20, 26 (E.D.N.Y. 2012). Section 1292(b) of Title 28 of the United States Code provides, in relevant part,

> "[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order[] . . . ."

28 U.S.C. § 1292(b). Thus, "the criteria for certification for interlocutory appeal under § 1292(b) are that the district judge 'be of the opinion' (i) that the 'order involves a controlling question of law as to which there is a substantial ground for difference of opinion,' and (ii) 'that an immediate appeal from the order may materially advance the ultimate termination of the

litigation.'" Securities Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 987 F. Supp. 2d

309, 311 (S.D.N.Y. 2013); accord In re Futter Lumber Corp., 473 B.R. at 26. "[O]nly

exceptional circumstances will justify a departure from the basic policy of postponing appellate

review until after the entry of judgment." Securities Inv'r Prot. Corp., 987 F. Supp. 2d at 311

(quotations and citation omitted); see also In re Futter Lumber Corp., 473 B.R. at 34 ("Courts

should construe the requirements for certification strictly and only exceptional circumstances will

justify certification."); Development Specialists, Inc. v. Akin Gump Strauss Hauer & Feld, LLP

("In re Coudert Bros. LLP Law Firm Adversary Proceedings"), 447 B.R. 706, 711 (S.D.N.Y.

2011) ("[A] party seeking leave to appeal a non-final order must demonstrate exceptional

circumstances to overcome the general aversion to piecemeal litigation and to justify a departure

from the basic policy of postponing appellate review until after the entry of a final judgment."

(quotations and citation omitted)).

     "To establish that an order contains a controlling question of law, it must be shown that

either (1) reversal of the bankruptcy court's order would terminate the action, or (2)

determination of the issue on appeal would materially affect the outcome of the litigation." In re

Futter Lumber Corp., 473 B.R. at 27 (quotations and citation omitted); accord In re Fairfield

Sentry Ltd. Litig., 458 B.R. 665, 673 (S.D.N.Y. 2011). Moreover, "[t]he 'question of law' must

refer to a 'pure' question of law that the reviewing court could decide quickly and cleanly

without having to study the record." In re Futter Lumber Corp., 473 B.R. at 27 (quotations and

citation omitted); accord In re Fairfield Sentry Ltd. Litig., 458 B.R. at 673.

     "Substantial ground for difference of opinion exists where (1) there is conflicting

authority on the issue, or (2) the issue is particularly difficult and of first impression for the

Second Circuit." In re Futter Lumber Corp., 473 B.R. at 29 (quotations and citation omitted); accord In re Coudert Bros. LLP Law Firm Adversary Proceedings, 447 B.R. at 712. "[T]he mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion," In re Futter Lumber Corp., 473 B.R. at 29 (quoting In re Flor, 79 F.3d at 284); accord In re Coudert Bros. LLP Law Firm Adversary Proceedings, 447 B.R. at 712; as is a mere claim that the bankruptcy court's decision was incorrect. See In re Futter Lumber Corp., 473 B.R. at 29.

The Objection Order does not involve a controlling question of law as to which there exists a substantial ground for a difference of opinion, and an immediate appeal therefrom will not materially advance the litigation. Moreover, this case does not present any exceptional circumstances warranting a departure from the final judgment rule. Accordingly, appellant's motion for leave to appeal to this Court from the interlocutory Objection Order is denied and the appeal is dismissed.[5]

---

[5] In any event, appellees, as parties in interest, properly sought the permission of the bankruptcy court to object to the 40 CPS Claims after the Trustee refused their request to interpose objections to those claims. The bankruptcy court properly exercised its discretion in granting appellees leave to file objections to the 40 CPS Claims once the Trustee refused to act, particularly since the Trustee's sole basis for refusing to act was economical, i.e., that in his business judgment, the expense of objecting to the 40 CPS Claims outweighed any potential benefit to the estate of the Debtor, but that concern was vitiated by appellees' assertion of the objection. Morever, allowing appellees to object to the 40 CPS Claims does not threaten the orderly and expeditious administration of the bankruptcy proceedings.

III.     Conclusion

For the reasons set forth above, appellant's motion for leave to appeal from the

interlocutory Objection Order is denied and the appeal is dismissed.

**SO ORDERED.**

_____/s/_____
Sandra J. Feuerstein
United States District Judge

Dated:  November 23, 2015
        Central Islip, New York